UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

v.

RICHARD LUCAS,

                        Defendant.

_____

**DECISION AND ORDER**

1:17-CR-00129 EAW

### INTRODUCTION

Defendant Richard Lucas ("Defendant") stands accused by way of a one-count Indictment returned on July 11, 2017, with conspiracy to possess with intent to distribute and to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846. (Dkt. 18). Defendant was initially charged with co-defendant Dominic Daniels, but Mr. Daniels pleaded guilty on July 19, 2018. (Dkt. 91). Defendant's trial is scheduled to commence on November 7, 2018. (Dkt. 76).

Presently before the Court is Defendant's omnibus pretrial motion seeking several forms of relief, including a motion to suppress evidence and statements obtained on May 15, 2017, when Defendant encountered law enforcement at a hotel parking lot, fled from the scene, ran through traffic on a busy roadway before being apprehended, and subsequently provided post-arrest statements during a law enforcement interview at the police station. For the reasons set forth below, the Court denies Defendant's motion to suppress. (Dkt. 35). In addition, as set forth below, the Court denies without prejudice the

other outstanding relief requested by Defendant in his omnibus motion (Dkt. 35), and the Court grants the Government's request for reciprocal discovery (Dkt. 42).

## PROCEDURAL BACKGROUND

On December 5, 2017, Defendant filed an omnibus pretrial motion seeking several forms of relief, including a motion to suppress evidence and statements obtained on May 15, 2017. (Dkt. 35). The Government filed papers in opposition to Defendant's motion on February 2, 2018. (Dkt. 42). On February 9, 2018, Defendant filed reply papers in further support of his motion. (Dkt. 44). On February 23, 2018, Defendant filed a supplemental motion to suppress, related to evidence obtained during an encounter with law enforcement on July 20, 2015, at the San Diego International Airport. (Dkt. 50). The Government filed papers in opposition to the supplemental motion on March 2, 2018. (Dkt. 53).

This Court initially referred all pre-trial matters to Magistrate Judge Jeremiah J. McCarthy pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Dkt. 19). Oral argument was held before Judge McCarthy on March 27, 2018, and an evidentiary hearing was scheduled to commence on May 7, 2018, concerning Defendant's motion to suppress evidence and statements from his July 20, 2015, and May 15, 2017, encounters with law enforcement. (Dkt. 59; Dkt. 60). The hearing commenced as scheduled on May 7, 2018, at which time the Government presented testimony from San Diego County Sheriff's Deputy Eric Mitchell and Town of Cheektowaga Police Sergeant Shawn McAdams, and it began the direct testimony of Erie County Sheriff's Deputy Adam Day. (Dkt. 68). Although initially scheduled to continue on May 17, 2018, Judge McCarthy adjourned the evidentiary hearing at the request of defense counsel, to July 13, 2018. (Dkt. 69; Dkt. 70; Dkt. 71).

This Court vacated the referral to Judge McCarthy, in order to ensure that pretrial proceedings were completed in time for the trial date of November 7, 2018, as discussed on the record at an appearance before the undersigned on May 17, 2018. (Dkt. 74; Dkt. 75). However, the referral remained in place with respect to Defendant's motion to suppress evidence and statements from his July 20, 2015, encounter with law enforcement at the San Diego International Airport. (Dkt. 72; Dkt. 73; Dkt. 74).[1] The evidentiary hearing remained scheduled for July 13, 2018, but was set to continue before the undersigned. (Dkt. 72; Dkt. 73; Dkt. 74).

On July 13, 2018, the suppression hearing continued before the undersigned with the completion of testimony from Deputy Day and the presentation of testimony from Drug Enforcement Agency ("DEA") Special Agent Christopher Wisniewski. (Dkt. 94). Defendant elected not to present any witnesses at the hearing, instead relying on his written declaration dated December 4, 2017. (Dkt. 35-3). Both parties submitted post-hearing memoranda on September 4, 2018 (Dkt. 111; Dkt. 113), and reply memoranda on September 7, 2018 (Dkt. 116; Dkt. 117).

---

[1]  On September 7, 2018, Judge McCarthy issued his Report and Recommendation recommending that the undersigned deny Defendant's motion to suppress evidence and statements resulting from his July 20, 2015, encounter with law enforcement at the San Diego International Airport. (Dkt. 115). Defendant timely filed objections to the Report and Recommendation on September 21, 2018 (Dkt. 121), and the Government's response was filed on October 4, 2018 (Dkt. 126). The Court will address the supplemental suppression motion in a separate decision.

## FINDINGS OF FACT

A.     Credibility Determinations

Making factual findings necessarily requires this Court to resolve factual disputes concerning Defendant's interactions with law enforcement on May 15, 2017. The Court had the opportunity to view Deputy Day and Agent Wisniewski testify during direct and cross-examination. In contrast, Defendant submitted a declaration wherein he states, in sworn statements, a strikingly different version of events as compared to Deputy Day's and Agent Wisniewski's testimony.

The Court found credible the testimony of both Deputy Day and Agent Wisniewski. The Court did not have the opportunity to evaluate Defendant's credibility through live testimony. Although Defendant submitted a sworn declaration, he was not subjected to cross-examination to test his version of events. *See California v. Green*, 399 U.S. 149, 158 (1970) (Cross-examination is "the 'greatest legal engine ever invented for the discovery of truth.'") (quoting 5 J. Wigmore, *Evidence* § 1367 (3d ed. 1940)). Moreover, the documentary evidence, including importantly the dash camera video reflecting the exchanges with Defendant following his arrest (*see* Govt. Ex.[2] 10), contradicts Defendant's claims that he requested and was denied medical treatment following his arrest—a critical allegation that Defendant relies on in support of his suppression motion. Thus, while the Court has considered Defendant's declaration, the Court affords greater weight to the live testimony from the law enforcement witnesses presented by the Government. *See, e.g.*,

---

[2]     "Govt. Ex." references the corresponding exhibit introduced by the Government at the suppression hearing.

*United States v. Choudhry*, 24 F. Supp. 3d 273, 275 n.1 (E.D.N.Y. 2014) (court may rely on hearsay and other evidence at suppression hearing, even though it would not be admissible at trial, but distinguishing that from hearsay contained in a non-testifying defendant's affidavit); *United States v. Paulino*, No. 12 Cr. 799(PA), 2013 WL 2237532, at *4 (S.D.N.Y. May 21, 2013) (placing greater weight on live testimony of law enforcement witnesses than defendant's declaration); *United States v. Miller*, 382 F. Supp. 2d 350, 362-63 (N.D.N.Y. 2005) (absent live testimony from a defendant, a court should consider a defendant's hearsay affidavit, but the weight afforded an affidavit "will be influenced by whether the affidavit is contradicted by more cogent evidence, especially that which withstands the scrutiny of cross-examination").

B.     Surveillance of Dominic Daniels and Comfort Inn and Suites

On May 15, 2017, Defendant rented Room #113 at the Comfort Inn and Suites Buffalo Airport Hotel located at 901 Dick Road, Cheektowaga, New York 14225 (hereinafter referred to as "the Comfort Suites"). (Dkt. 35-3 at ¶ 3). On that date, Deputy Adam Day, who has worked in law enforcement for approximately ten years, was performing surveillance of Mr. Daniels with Erie County Sheriff's Deputy Milbrandt at the Comfort Suites. (T[3] at 104-106, 109, 122). A search warrant had been signed that day by

---

[3]     The transcript of the suppression hearing conducted on May 7, 2018, before Judge McCarthy was filed at docket number 83 (pages 1 through 144), and the transcript of the suppression hearing conducted on July 13, 2018, before the undersigned was filed at docket number 94 (pages 145 through 286). As noted, the transcripts are consecutively paginated. The Court will simply refer to "T" and the corresponding transcript page (not CM/ECF page) when citing the suppression hearing transcript.

a state court judge at 12:21 PM for Mr. Daniels and any vehicle he was operating. (*Id.* at 106-107; Govt. Ex. 4). Deputies Day and Milbrandt were performing their surveillance of the only entrance/exit to the motel parking lot so that they could observe any vehicles entering and exiting. (T at 111-112). Deputy Day was not wearing a police uniform and was in an unmarked vehicle. (Dkt. 35-3 at ¶ 8; T at 155).

On the date in question, Deputy Day observed Mr. Daniels driving out of the Comfort Suites parking lot in a white pickup truck, but he and Deputy Milbrandt did not follow him. (T at 112, 115-116). Mr. Daniels was identified as having a blue package. (*Id.* at 115). Deputy Day testified that, at the time of the surveillance, he had information that Defendant was working with Mr. Daniels. (*Id.* at 116-117). The deputies had a photograph of Defendant and information that he had "possibly worked with Dominic Daniels in the past and that there was prior search warrants with Richard Lucas, so he could be a person of interest" (*id.* at 117), and that he "could be in the area" (*id.* at 118).

Sometime[4] after Mr. Daniels left the Comfort Suites, Defendant and his 14-year old son arrived at the hotel's parking lot in a black 2017 Corvette bearing a Texas license. (Dkt. 35-3 at ¶¶ 4, 7). The Corvette had its hard-top roof removed. (*Id.* at ¶ 7). Deputy

---

[4]     Defendant states in his declaration that he arrived at the Comfort Suites at approximately 7:00 PM on May 15, 2017. (Dkt. 35-3 at ¶ 7). Deputy Day testified that Defendant arrived at the Comfort Suites "ballpark" one hour after Mr. Daniels left the hotel. (T at 118). The criminal complaint states that Mr. Daniels left the Comfort Suites at approximately 5:07 PM. (Dkt. 1 at ¶ 7). The dash camera video reflecting events occurring after Defendant's interaction with Deputy Day in the Comfort Suites parking lot, commences at approximately 6:51 PM. (T at 90; Govt. Ex. 9). Therefore, Defendant arrived at the Comfort Suites parking lot prior to 7:00 PM, but the exact time is not clear based on the record before the Court. Of note, the video of the surveillance of Mr. Daniels apparently had an issue with the accuracy of its time stamp. (T at 110; Govt. Ex. 5).

Day observed the Corvette "with dark tinted windows" drive into the parking lot. (T at 119). According to Deputy Day, the windows were "so dark we couldn't see in the vehicle" in violation of New York Vehicle and Traffic Law § 375(12-a)(b)(2). (*Id.*). Deputy Day testified that the Corvette's windows were raised and the top was off. (*Id.* at 120). Defendant did not address the condition of the windows or their position in his declaration. (*See* Dkt. 35-3 at ¶ 7 (Defendant stating that Corvette had hard top roof removed, but not indicating whether windows were raised or tinted)). Deputy Day testified that he is authorized to stop people who are driving vehicles with excessively tinted windows. (T at 120). Deputy Day explained that under New York law, 70% of light has to be visible through the side windows, and occupants inside a vehicle are observable when a vehicle has tint within the allowable scope. (*Id.* at 120-121). In the case of the Corvette, the occupants were not observable. (*Id.* at 121).

Upon arriving, Defendant drove to the rear of the building and parked next to the pool/fitness center entrance. (Dkt. 35-3 at ¶ 7). Deputies Day and Milbrandt followed the Corvette in their vehicle around the motel parking lot, and "[b]y the time we pulled around, we seen two occupants walking from the vehicle walking to get into the hotel." (T at 121-122). Defendant and his son exited the vehicle and attempted to enter the hotel through the pool/fitness center entrance, but the door was locked. (Dkt. 35-3 at ¶ 7; T at 122). They walked back to the car. (Dkt. 35-3 at ¶ 7). Defendant intended to drive to the front entrance to gain access to the hotel. (*Id.*). According to Deputy Day, when Defendant and his son observed Deputies Day and Milbrandt they "immediately went back to their vehicle." (T at 122). At that point, Deputy Milbrandt stated to Deputy Day that he believed one of the

individuals could be Defendant. (*Id.* at 123). The occupants were described by Deputy Day as two black males, one older and one younger, with the younger individual appearing to be approximately 5'11" and 190-200 pounds. (*Id.*). Deputy Day later learned that the younger individual was Defendant's 14-year old son. (*Id.* at 130).

C.     Stop of Defendant's Vehicle

There is no dispute that Deputy Milbrandt pulled his vehicle behind the Corvette so that it could not back up. (*Id.* at 123-124; Dkt. 35-3 at ¶ 8). Deputies Day and Milbrandt exited their vehicle and walked up to the Corvette, with Deputy Milbrandt approaching the driver's side of the Corvette, and Deputy Day at the passenger side. (T at 124; *see* Dkt. 35-3 at ¶ 8). Deputy Day testified that he and Deputy Milbrandt identified themselves as law enforcement, with Deputy Day displaying his badge/shield. (T at 123-125). Defendant stated in his declaration that the officers did not identify themselves, and they had no markings to identify themselves as law enforcement. (Dkt. 35-3 at ¶ 8).

Whether the deputies identified themselves to Defendant is a major discrepancy between Deputy Day's testimony and Defendant's version of events. In other words, Defendant's version of events and justification for his subsequent actions is largely based on his contention that he felt threatened because he did not know the identity of the individuals who approached him. As noted above, the Court finds Deputy Day's testimony credible, and much more plausible than Defendant's version of events. Thus, the Court has not credited Defendant's allegations that the deputies never identified themselves. Rather, the Court concludes that upon approaching the Corvette, Deputies Day and

Milbrandt identified themselves, with Deputy Day displaying his badge. (*See* T at 124-125).

The parties agree that, upon approaching the Corvette, Deputy Milbrandt inaccurately told the occupants that they were investigating activity related to cars in the parking lot. (*Id.* at 125). Deputy Day explained that they used this excuse to keep the occupants calm and at ease (as opposed to relaying that they were investigating narcotics trafficking). (*Id.* at 126, 162).

Deputy Milbrandt asked the driver for identification and Deputy Day asked the passenger for identification. (*Id.* at 126). The passenger replied that he did not have identification, and the driver (identified as Defendant) appeared "really nervous." (*Id.*). Deputy Day described Defendant's appearance and behavior as follows: "He was sweating. His chest was pounding, breathing really hard. Stuttering a little bit." (*Id.*). According to Deputy Day, Defendant expressed anger at the deputies for stopping him, and Deputy Day explained to Defendant that he was driving with tinted windows in violation of New York law. (*Id.*).

According to Defendant's version of events, the deputies started opening the Corvette's doors, and one of the deputies stated, in sum and substance, that "kids were playing with cars in the parking lot." (Dkt. 35-3 at ¶ 8). Defendant contends that he got out of his car to confront the deputies, stating, in sum and substance, "Do I look like a kid to you? What do you want?" (*Id.*).

Deputy Day testified that Defendant said his name was "Rich" and he began to open the door, at which point Deputy Milbrandt told him to stay in the vehicle. (T at 127).

Defendant continued to exit the vehicle, prompting Deputy Day to relocate to the driver's side "for everybody's safety." (*Id.*).

According to Deputy Day, once Defendant emerged from the vehicle, he was instructed by the deputies to put his hands on the vehicle, and he initially complied and put his hands on the driver's side rear fender. (*Id.* at 128). However, Defendant kept taking his hands off the vehicle and was "trying to turn on us." (*Id.*). In addition, Defendant refused to provide identification or his full name. (*Id.* at 167, 170-171). The deputies told him two or three times to put his hands on the vehicle and relax so that they could "do a quick pat frisk" and check for "weapons for everybody's safety." (*Id.* at 128). Deputy Day put his hand on Defendant's thigh, at which point Defendant turned again, and Deputy Day physically put Defendant's hands on the rear fender stating, "listen, if you keep on doing this, we're going to put you in cuffs. . . ." (*Id.*). At that point, Defendant turned again and Deputy Day told Defendant they were going to put him in handcuffs. (*Id.*). Deputy Day was concerned for his safety because Defendant was not complying with his directions, and in his experience, those circumstances mean "it's usually going to be flight or fight." (*Id.* at 129).

D.     Defendant's Flight and Apprehension

The deputies tried to handcuff Defendant, but Defendant ran through the deputies, causing everyone to fall to the ground. (*Id.*). Deputy Day testified that he and Deputy Milbrandt were trying to place Defendant in handcuffs while on the ground. (*Id.* at 171). The passenger exited the vehicle, ran behind Deputy Milbrandt, and either tackled Deputy

Milbrandt or placed him in a choke hold. (*Id.* at 129, 171). This allowed Defendant to get up from the ground and he started running. (*Id.* at 129).

Defendant states in his declaration that when one of the deputies touched him, it caused him to panic, and Defendant broke free of his grasp and ran away. (Dkt. 35-3 at ¶ 9). Defendant also told his son to "run." (*Id.*).

Deputy Day got up from the ground and ran after Defendant. (T at 129). Deputy Day caught up to him and "dove," causing them both to fall to the ground. (*Id.* at 132). Defendant got up and continued running, with Deputy Day chasing him. (*Id.*; *see* Dkt. 35-3 at ¶ 9). Defendant ran to an occupied vehicle and tried to get in, but ran away when Deputy Day approached. (T at 132). Defendant then attempted to pull the same maneuver with another vehicle. (*Id.*). Deputy Day believed that Defendant was attempting to carjack the vehicles. (*Id.* at 133). Defendant did this three separate times. (*Id.*).

Defendant makes no reference to these alleged carjack attempts in his declaration. Defendant eventually ran onto Genesee Street, with Deputy Day following him. (*Id.*). Defendant was running in and out of traffic and around cars. (*Id.*).

In the meantime, Agent Wisniewski, who has been a DEA Special Agent for almost 20 years and who has been investigating Defendant's alleged narcotics trafficking since 2016 (*id.* at 177), was driving back to the Comfort Suites in a vehicle with Special Agents Frank Zabawa and T.J. Webb (*id.* at 195). Agent Wisniewski observed Defendant running from Deputy Day on Genesee Street. (*Id.*). The agents exited the vehicle and assisted in

the apprehension of Defendant. (*Id.*). Defendant was tackled, handcuffed, and taken into custody. (*Id.* at 134, 137, 155; 195; 219-220; *see* Govt. Ex. 9).[5]

Defendant states that the men tackled him and pushed the side of his body into a concrete divider. (Dkt. 35-3 at ¶ 10). Defendant hit the divider and the ground hard. (*Id.*). Defendant states that his ribs hurt, he was short of breath, and he was in pain. (*Id.*). He was transported back to the Comfort Suites in a police car, and Defendant contends that when they arrived he could see that his son was in custody. (*Id.* at ¶¶ 10-11). Defendant states that he was in a lot of pain and asked for medical attention. (*Id.*). Defendant alleges that he was asked questions such as "why did you run" and "what rooms did you rent at the hotel," and that he had not been read *Miranda* warnings. (*Id.* at ¶ 11).

However, the dash camera in the patrol car being operated by Sergeant McAdams and his partner, Patrolman Justin Haag, who transported Defendant back to the Comfort Suites, recorded the interactions with Defendant. (T at 86-87, 94; Govt. Ex. 10). Sergeant McAdams and Patrolman Haag repeatedly asked Defendant if he needed medical assistance, and Defendant repeatedly declined those offers, indicating that he was just out of breath and did not need medical attention. (T at 89, 94-97).

---

[5] There was a discrepancy as to who tackled Defendant. Agent Wisniewski testified that Defendant was tackled on Genesee Street by Agent Zabawa, Agent Webb, and Agent Wisniewski, in that order. (T at 219-220). Deputy Day testified that he tackled Defendant, after which time two or three agents got out of their vehicle to assist him. (*Id.* at 137). Although this testimony is inconsistent, the Court does not view it as material to its factual findings, nor does it impact the Court's credibility determinations.

E.  Interview of Defendant at Sheriff's Office

Defendant was ultimately transported to the Sheriff's Office. (Dkt. 35-3 at ¶ 11; T at 199). Defendant maintains that he was handcuffed to a bench, his ribs continued to hurt, he was having trouble breathing, and his requests for medical attention were ignored. (Dkt. 35-3 at ¶ 12).

According to Agent Wisniewski, he and Agent Webb interviewed Defendant in a room at the Sheriff's Office. (T at 200). Defendant was not in handcuffs, and although Agent Wisniewski and Agent Webb were both carrying firearms, their weapons were concealed and not visible. (*Id.* at 200-201). At no point that evening, even during Defendant's arrest, did Agent Wisniewski display his weapon. (*Id.* at 201). In fact, there was no testimony during the suppression hearing that firearms were displayed during law enforcement's encounter with Defendant on May 15, 2017.

Agent Wisniewski testified that after entering the interview room and making introductions, Agent Wisniewski read Defendant his *Miranda* warnings. (*Id.*). Agent Wisniewski provided the warnings by reading from a card that he carries (called a DEA Form 13A). (*Id.*; Govt. Ex. 14). Agent Wisniewski testified that Defendant responded "yes" when asked if he understood the *Miranda* warnings. (T at 203). Defendant then responded in the affirmative that he was willing to answer some questions. (*Id.*). However, Defendant did not want to talk about Mr. Daniels. (*Id.* at 215).

Agent Wisniewski described the environment and Defendant's demeanor during the interview as follows: "He was comfortable, he was confident. He seemed intelligent and articulate, and the conversation was very free flowing." (*Id.* at 210). The interview was

not contentious at any point. (*Id.*). The interview lasted a little more than an hour. (*Id.*). During the interview, Defendant provided detailed information about his drug trafficking activities. (*Id.* at 210-216). At no point during the conversation did Defendant appear to be in distress or confused as to what was happening. (*Id.* at 212).

Defendant asserts that he asked the agents to take him to a hospital, but they stated they wanted to talk to him first, and only afterwards would they take him to a hospital. (*Id.*). In contrast, Agent Wisniewski testified that during the interview, Defendant appeared to be in "[a] little" discomfort because he "kept rotating his shoulder or touching his upper chest area" but when asked if he needed any medical attention, Defendant responded that he did not. (*Id.* at 203-204). Defendant explained that it was just an old auto injury. (*Id.* at 204). Defendant never asked for medical attention during the interview, and Agent Wisniewski was unaware of Defendant asking any other officer for medical attention. (*Id.*).

Defendant alleges that the officers threatened Defendant's son, stating, in sum and substance, that he "would not see the streets until he was 21 years old." (Dkt. 35-3 at ¶ 13). The officers also threatened Defendant's girlfriend. (*Id.*). Agent Wisniewski denied threatening either Defendant's son or girlfriend. (T at 216). In fact, Agent Wisniewski testified that Defendant never asked about his son. (*Id.* at 276).

Agent Wisniewski believed that the interview was being recorded, but the equipment malfunctioned and, as a result, no recording was made. (*Id.* at 204-205). Because he thought the interview was recorded, Agent Wisniewski believed that the reading of *Miranda* warnings would be captured on video, and he did not have Defendant

sign a form acknowledging the *Miranda* warnings. (*Id.* at 207-208). Agent Wisniewski testified that at no point during the interview did Defendant appear not to understand the questions being asked, and when asked questions he responded appropriately. (*Id.* at 204).

According to Defendant, after these initial threats and statements, he was read his rights, at which point he asked to call a lawyer, identifying Jeremy Schwartz as his attorney. (Dkt. 35-3 at ¶ 14). Defendant claims that the officers told Defendant it would be better if he answered their questions (*id.*), and he states that he answered the questions, while in pain and thinking of the threats to his son and girlfriend (*id.* at ¶ 15). In contrast, Agent Wisniewski testified that Defendant never asked for an attorney. (T at 204, 216-217).

On cross-examination, Agent Wisniewski testified that he discussed in a very generalized manner cooperation with Defendant and potential benefits that may result. (*Id.* at 237-239). Agent Wisniewski does not recall discussing proactive cooperation with Defendant, but it was possible. (*Id.* at 274). Defendant expressed concerns about potential charges, and Agent Wisniewski told him that he was probably going to be charged federally for narcotics violations. (*Id.* at 239). Agent Wisniewski told Defendant, in sum and substance, that he was in serious trouble. (*Id.* at 240). Agent Wisniewski does not recall discussing bail with Defendant, and would have told him that he had little or no control over that process. (*Id.* at 274).

F.     Consent to Search Cell Phones

About halfway to three-quarters of the way through the interview, Agent Wisniewski asked that Defendant consent to a search of his two cell phones. (*Id.* at 206).

- 15 -

Agent Wisniewski completed a Consent to Search Form and Defendant signed it. (*Id.* at 208; Govt. Ex. 22).

Defendant was provided the form so that he could read it, and Agent Wisniewski also explained the form to Defendant. (T at 209). Defendant placed his initials by each of the following statements on the form:

I have read, understand and do initial the following:

That this search is requested for the purposes of a criminal investigation and/or fire scene investigation

That I am not required by law or other official authority to allow this search

That anything found by the law enforcement officers considered necessary for their investigation will be collected and removed as evidence, and that any evidence found may be used in a criminal prosecution against anyone arrested for committing the crime(s) related to the evidence

That I may withdraw my consent to search at any time, but I must notify the law enforcement officers that request this consent to search of my withdrawal

(Govt. Ex. 22).

Defendant then signed the form, underneath the statement: "I further declare that this waiver is freely and voluntarily given, without any promises made to me on May 15, 2017, at 9:33 PM." (*Id.*).

Defendant made no indication that he did not understand the form. (T at 209). Similarly, Defendant never indicated that he did not understand the form because he needed medical attention. (T at 209-210).

While admitting that he filled out the form requesting consent to search the phones, Defendant states that he was in a great deal of pain due to his rib injury, and again, he was thinking of his son and girlfriend. (Dkt. 35-3 at ¶ 16).

G.    Defendant's Alleged Injuries

Defendant contends that when he was ultimately taken to the hospital the next morning, he was diagnosed with two broken ribs and one fractured rib, he was injected with pain medication and prescribed narcotic pain killers, and it took him weeks to recover from his injuries. (*Id.* at ¶ 17). Defendant's medical records were never submitted to the Court as part of the record (*cf.* T at 279 (defense counsel indicating intention to submit certified copies of medical records)), and thus the extent of Defendant's medical injuries is based solely on his declaration.

## ANALYSIS

## I.    THE INITIAL STOP AT THE COMFORT SUITES PARKING LOT

A.    The Parties' Contentions

Defendant maintains that he was illegally seized when the Sheriff's deputies first attempted to restrain him at his vehicle, and therefore, all evidence derived from that initial illegal seizure must be excluded as fruits of the poisonous tree. (Dkt. 35-1 at 7). Defendant contends that the officers had no "solid connection" of criminal activity linking Mr. Daniels and Defendant, and as a result, the officers lacked probable cause to arrest Defendant. (*Id.* at 8-9). Defendant alleges that he was seized by the law enforcement officers when they blocked his car with their own vehicle and placed their hands on him in an attempt to frisk and cuff him. (*Id.* at 10). Defendant rejects any contention that the initial stop was simply

an investigatory *Terry* stop, arguing that the officers' true motives were to arrest him based upon their suspicions concerning his drug trafficking. (*Id.*). Additionally, Defendant insists that any initial investigatory stop quickly evolved into an arrest because of the officers' actions—including physically removing Defendant from the vehicle. (*Id.* at 10-12).

In his post-hearing submission, Defendant's position evolved to some extent. He argues that the officers who stopped him did not have information sufficient to justify reasonable suspicion, and that the sole reason offered by Deputy Day for the stop was tinted windows. (Dkt. 113 at 22-23). Defendant contends that Deputy Day's testimony concerning the tinted windows should be rejected because: (1) the photograph of the Corvette (Govt. Ex. 12) contradicts Deputy Day's testimony that he could not see Defendant through the front window, and it further contradicts his testimony that the side windows were up (they are down in the photograph); (2) there is no reference in the reports to a Vehicle and Traffic law violation, and no summons was issued for the window tinting; (3) the vehicle was not observed on a public road, but rather in a parking lot; and (4) there was no corroboration for Deputy Day's testimony, such as a "tintometer." (Dkt. 113 at 23-25). Defendant also asserts that even if there was a basis for the initial stop, the later actions by the officers were inappropriate and not justified. (*Id.* at 25).

The Government maintains that Deputies Day and Milbrandt reasonably suspected that Defendant was involved in unlawful activity based upon the evidence uncovered related to Defendant's involvement in narcotics trafficking, his relationship with Mr. Daniels, and Mr. Daniels' activities on the date in question. (Dkt. 42 at 6-7; Dkt. 111 at 7-

8).  Moreover, the Government contends that alternatively, even if there was a lack of reasonable suspicion concerning Defendant's involvement in narcotics trafficking, Deputies Day and Milbrandt had probable cause to stop Defendant's vehicle because of their determination that the vehicle contained tinted windows in violation of New York State Vehicle and Traffic Law § 375(12-a)(b)(2).  (Dkt. 42 at 7; Dkt. 111 at 8).  The Government also argues that parking behind Defendant's vehicle did not cause the investigative stop to rise to the level of an arrest, and once Defendant became noncompliant, agitated, and aggressive, the need to restrain him arose, but the deputies were unable to do so.  (Dkt. 42 at 8-9; Dkt. 111 at 10).  Then, once Defendant began to struggle with the deputies, "there was probable cause to arrest him for harassment, in violation of New York Penal Law Section 240.26(1); resisting arrest, in violation of New York Penal Law Section 205.30; obstructing governmental administration, in violation of New York Penal Law Section 195.05; and assaulting a police officer, in violation of New York Penal Law Section 120.05(3), among other crimes." (Dkt. 111 at 10).  Furthermore, the Government submits that even if this Court concludes that the initial stop was illegal, Defendant committed new crimes, thus justifying his arrest and negating the applicability of the exclusionary rule.  (Dkt. 116 at 5-9).

B.    Legal Standard

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical

force or show of authority,' terminates or restrains his freedom of movement, '*through means intentionally applied.*'" *Brendlin v. California*, 551 U.S. 249, 254 (2007) (citations omitted) (emphasis in original). "The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver 'even though the purpose of the stop is limited and the resulting detention quite brief.'" *Id*. at 255 (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)); *see Whren v. United States*, 517 U.S. 806, 809-10 (1996) ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]. . . .").

Because it constitutes a seizure for Fourth Amendment purposes, a traffic stop "must satisfy the Fourth Amendment's reasonableness limitation, which 'requires that an officer making a traffic stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity.'" *United States v. Gomez*, 877 F.3d 76, 86 (2d Cir. 2017) (quoting *United States v. Stewart*, 551 F.3d 187, 191 (2d Cir. 2009)); *see Stewart*, 551 F.3d at 193 ("[W]e now hold unambiguously that the reasonable suspicion of a traffic violation provides a sufficient basis under the Fourth Amendment for law enforcement officers to make a traffic stop.").

Here, the Government has the burden of proving by a preponderance of the evidence that a seizure did not violate the Fourth Amendment. *See generally United States v. Arboleda*, 633 F.2d 985 (2d Cir. 1980). "Traffic stops are presumptively reasonable under the Fourth Amendment if the officer has probable cause to believe that a traffic infraction

has occurred." *United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015) (citing *Whren*, 517 U.S. at 810 ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.")); *accord Rodriguez v. United States*, ___ U.S. ___, 135 S.Ct. 1609, 1614 (2015) ("[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns." (citations omitted)).

Pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), a law enforcement officer may initiate a "stop" based upon "a reasonable suspicion of criminal activity supported by specific and articulable facts." *Foreste*, 780 F.3d at 523. Reasonable suspicion is "considerably less than proof of wrongdoing by a preponderance of the evidence" and "obviously less demanding than that for probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "The existence of reasonable suspicion is not a purely legal issue; rather, it is a mixed question of law and fact dependent on the totality of the circumstances." *Gomez*, 877 F.3d at 92. Reasonable suspicion must be "supported by articulable facts that criminal activity may be afoot," and it cannot be based on "inchoate suspicion or mere hunch." *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013) (quoting *Sokolow*, 490 U.S. at 7 and *United States v. Bayless*, 201 F.3d 116, 132-33 (2d Cir. 2000)). While a court should evaluate the totality of the circumstances "through the eyes of a reasonable and cautious

police officer on the scene, guided by his experience and training," a court should not "merely defer to the police officer's judgment." *Id.* (quoting *Bayless*, 201 F.3d at 133).

New York law prohibits the operation of a vehicle on a "public highway, road or street" with side windows that "are composed of, covered by or treated with any material which has a light transmittance of less than seventy percent. . . ." N.Y. Veh. & Traf. Law § 375(12-a)(b)(2). Stopping a vehicle based upon probable cause or reasonable suspicion that a vehicle is being operated with tinted windows in violation of § 375(12-a)(b)(2), even if the officers' true motivations are driven by a desire to investigate other illegal activity, complies with the Fourth Amendment. *See United States v. Harrell*, 268 F.3d 141, 148-49 (2d Cir. 2001) (objectively reasonable officer would have suspected windows were tinted in violation of § 375(12-a)(b)); *United States v. Morgan*, 17 Cr. 354 (KBF), 2017 WL 4621632, at *3 (S.D.N.Y. Oct. 12, 2017) (collecting cases finding probable cause to stop vehicle for excessively tinted windows). In other words, law enforcement agents' true objectives are not relevant to the analysis. *Whren*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *see also Gomez*, 877 F.3d at 97 ("[I]t is well established that 'an officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence to some more serious crimes is of no constitutional significance.'" (quoting *United States v. Dhinsa*, 171 F.3d 721, 724-25 (2d Cir. 1998))); *United States v. Williams*, No. 07-CR-6124L, 2008 WL 4516234, at *5 (W.D.N.Y. Oct. 2, 2008) (stop was lawful even if tinted windows were pretext for stop).

Even if initially permissible, an investigative stop "may become an unlawful arrest if the means of detention are 'more intrusive than necessary.'" *United States v. Tehrani*,

49 F.3d 54, 61 (1995) (quoting *United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993)).

Simply blocking off a vehicle so that it is unable to depart the scene does not constitute a *de facto* arrest. *United States v. Garcia*, 339 F.3d 116, 119 (2d Cir. 2003) ("We have previously rejected the argument that a *Terry* stop necessarily becomes an arrest if the police 'used their cars to block [defendant's] vehicle' and 'approached [the] stopped car with guns drawn in order to protect themselves and bystanders.'" (quoting *Perea*, 986 F.2d at 644)).

> In determining whether an investigatory stop is sufficiently intrusive to ripen into a *de facto* arrest, the Second Circuit considers the "amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used."

*United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004) (quoting *Perea*, 986 F.2d at 645).

"[W]here an officer has a reasonable basis to think that the person stopped poses a present physical threat to the officer or others, the Fourth Amendment permits the officer to take 'necessary measures . . . to neutralize the threat' without converting a reasonable stop into a *de facto* arrest. This doctrine has supported a range of restraints incident to a stop, from the pat-down at issue in *Terry*, to the drawing of firearms, to the use of handcuffs." *United States v. Newton*, 369 F.3d 659, 674-75 (2d Cir. 2004) (citations omitted).

C.    Analysis

    1.    The Tinted Windows Justified The Stop

The credible evidence establishes by a preponderance of the evidence that Deputies Day and Milbrandt were fully justified in their initial stop of Defendant because of the

- 23 -

objectively reasonable belief that he was operating a vehicle with side windows that were unlawfully tinted in violation of Vehicle and Traffic Law § 375(12-a)(b)(2). Deputy Day credibly testified as to his experience and familiarity with § 375(12-a) as it pertained to tinted windows (T at 104-105, 119-121, 163), and he also credibly testified that he concluded the Corvette's windows were illegally tinted because he was unable to observe the occupants of the vehicle (*id.* at 118-121). Moreover, it was objectively reasonable to believe that the vehicle had been operating on a public roadway because Deputies Day and Milbrandt had stationed themselves to observe any vehicles entering the parking lot. (T at 111-112, 119). Based upon the totality of the circumstances, the deputies had probable cause to believe that the Corvette was being operated in violation of the Vehicle and Traffic Law, and at a minimum, they had a reasonable suspicion of the traffic violation.

Defendant does not address the window tinting in his declaration. (*See* Dkt. 35-3 at ¶ 7 (Defendant stating that Corvette had hard top roof removed, but not indicating whether windows were tinted)). Instead, he challenges the evidence concerning the window tinting by attacking Deputy Day's credibility.

Defendant insists that Deputy Day's testimony was not credible because he "testified that he could not see Mr. Lucas through the front window" but the photograph of the Corvette (Govt. Ex. 12) "shows that there was an appropriate light transmittance through the front window." (Dkt. 113 at 23). However, Deputy Day never testified that he was unable to see the occupants of the Corvette through the front window—rather, his

testimony at the suppression hearing made it clear that the excessive tinting issue was with the side windows. (T at 119-120).[6]

Defendant also maintains that the photograph of the Corvette (Govt. Ex. 12) contradicts Deputy Day's testimony, because the side windows are lowered in the photograph. However, the Corvette was photographed after it had been moved to the parking lot of the Sheriff's Office subsequent to Defendant's arrest. (T at 119, 156). Deputy Day credibly testified that contrary to the photograph, the side windows were raised at the time Defendant entered the Comfort Suites parking lot. (T at 120).

Furthermore, contrary to Defendant's argument (Dkt. 113 at 24), separate corroborating evidence of a "tint meter" reading is not required for the Government to meet its burden, nor is the Government required to establish that Defendant was ticketed for the violation. *See, e.g.*, *Morgan*, 2017 WL 4621632, at *5 (where officer testified as to his belief that windows were unlawfully tinted, even if evidence had been offered that windows were not illegally tinted, there would still be probable cause to stop the vehicle because it was objectively reasonable to suspect that windows were unlawfully tinted); *United States v. Garcia*, 279 F. Supp. 2d 294, 299 (S.D.N.Y. 2003) ("The fact that Officer Argila never tested the windows with a 'tint meter' to determine if they were, in fact, in violation of the law is immaterial, as only an objectively reasonable belief or suspicion of a violation, supported by articulable facts, is required."); *United States v. Odom*, No. 03

---

[6]    Deputy Day testified that at the time the Corvette pulled into the parking lot, he and Deputy Milbrandt were facing in a southbound direction (T at 119), and the Corvette drove past them heading in an eastbound direction (T at 121). Thus, it makes sense that he had the opportunity to view the side windows of the Corvette as it passed.

CR.1201(SCR), 2004 WL 1179309, at *3-4 (S.D.N.Y. Apr. 30, 2004) (as long as officer held objectively reasonable belief or suspicion that windows of vehicle were unlawfully tinted, stop is valid, and it is immaterial whether windows were tested with "tint meter" or ticket was issued for violation).

The state lower court case relied upon by Defendant, *People v. Anonymous*, 60 Misc.3d 405 (N.Y. Crim. Ct., Bronx Co. 2018), does not warrant a different result. In that case, the officer simply testified that the windows were tinted, without providing any testimony or evidence (such as results from a "tintometer") that the windows were unlawfully tinted in excess of the amount allowed under the law. *Id.* at 409. Here, in contrast, Deputy Day testified that his inability to observe the occupants informed him, based on his experience, that the windows were illegally tinted with material that had a light transmittance of less than 70%.

Because the Court concludes that Deputies Day and Milbrandt had probable cause to believe that a traffic violation occurred, the Court does not need to resolve the issue of whether the officers were likewise justified in stopping Defendant based upon reasonable suspicion of narcotics trafficking. The Court acknowledges that this could possibly serve as a separate basis for the initial stop, as the deputies had information about Defendant's alleged narcotics trafficking and association with Mr. Daniels, and Mr. Daniels had just recently left the Comfort Suites with a package that was discovered to contain cocaine. However, there are some gaps in the record on this issue.

First, while the defense appears to concede that by the time of his encounter with Defendant, Deputy Day "had learned that Daniels had been stopped and that an amount of

cocaine had been seized from him," (Dkt. 113 at 7 n.6), the Court is not convinced that the record supports this conclusion. The following testimony was elicited on this subject at the suppression hearing:

> Q   Now prior to your encounter with Richard Lucas, do you know whether Dominic Daniels had been stopped already?
>
> A   I believe he was stopped at that point.
>
> Q   And do you know what if anything was taken from him?
>
> A   An amount of cocaine.

(T at 127). At the time he testified, Deputy Day plainly knew that Mr. Daniels had been stopped with cocaine, but it is not clear from Deputy Day's testimony that *at the time of his encounter* with Defendant, he knew about Mr. Daniels' stop. The testimony was not developed on this point. If this had been established in the record, the Court believes that it would support a conclusion of reasonable suspicion to justify the stop of Defendant independently from the traffic violation, but the record is not clear on this point.[7]

Second, the extent of Deputy Day's familiarity with the background investigation concerning Defendant is unclear. Deputy Day's direct testimony on this subject was as follows:

> Q   Now, what type of information did you have about Mr. Lucas that day?
>
> A   We received information, a photo of Richard Lucas, saying that he is—possibly worked with Dominic Daniels in the past and that there

---

[7]   The criminal complaint states that a narcotics transaction involving Mr. Daniels was observed at approximately 6:12 PM. (Dkt. 1 at ¶ 8). After that transaction, a traffic stop of Mr. Daniels was performed resulting in the discovery of approximately 794 grams of cocaine, $17,000 in U.S. currency, and a hotel key for Room #113 at the Comfort Suites.

was prior search warrants with Richard Lucas, so he could be a person of interest.

        MR. GREENMAN: I couldn't hear the last part. Your voice sort of trailed off.

        THE WITNESS:    That he was a person of interest because he has worked with Dominic Daniels in the past, and that he could be in the area.

(T at 117-118; *see also* T at 161-162 (referencing an email on the subject of Defendant during cross-examination, but not providing any specifics)). The testimony was not further developed, and thus, the actual information about Defendant that was known to Deputy Day is vague.

While under the collective knowledge doctrine, the officers effectuating the stop need not be aware of all details related to the investigation (so that knowledge of others involved in the investigation, such as Agent Wisniewski, could be imputed to those conducting the investigatory stop), *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001), there is no evidence here that the officers with actual knowledge of Defendant's alleged drug trafficking activities directed or took actions causing the stop by Deputies Day and Milbrandt. At best, the role played by the officers with knowledge is that they arranged for Deputies Day and Milbrandt to be conducting the surveillance of the Comfort Suites with some information (including a photograph) about Defendant. Whether that is sufficient under the circumstances to impute to Deputies Day and Milbrandt the collective

---

(Dkt. 1 at ¶ 9; *see* T at 192-193). As noted above at footnote 4, Defendant arrived at the Comfort Suites before 7:00 PM, but the exact time is not clear, thus creating uncertainty as to whether, in fact, the stop of Mr. Daniels occurred prior to Deputy Day's encounter with Defendant.

knowledge of those involved in the investigation is not an issue that this Court needs to resolve. *Cf. United States v. Conley*, Criminal Case No. 3:17-CR-214, 2018 WL 4502180, at *7 (D. Conn. Sept. 20, 2018) (surveillance team directing stop had reasonable suspicion to stop the defendant's vehicle and under the collective knowledge doctrine, their knowledge was imputed to the officers who actually conducted the investigatory stop, even though those officers did not know the reason for the stop).

Again, the Court concludes that the deputies' observations of the Corvette's tinted windows provided probable cause (or at least reasonable suspicion) justifying the stop, and as a result, there is no need for the Court to resolve whether reasonable suspicion of Defendant's alleged narcotics trafficking activities independently justified the initial stop. Deputies Day and Milbrandt were well within the permissible scope of the Fourth Amendment when they pulled up behind the Corvette and approached the vehicle.

2.    Activities After The Initial Stop

With the understanding that the initial stop of Defendant was justified based upon the reasonable belief of a traffic violation, the Court now turns to the issue of whether law enforcement's conduct after the stop, ultimately resulting in Defendant's apprehension and arrest on Genesee Street, was similarly justified, or as Defendant claims, whether the "later actions by the officers were inappropriate." (Dkt. 113 at 25).

A resolution of this issue is necessarily influenced by whether the events unfolded after the initial stop as claimed by Defendant or as testified to by Deputy Day. The Court concludes that Deputy Day presented the more credible version of events. Specifically, the Court concludes that Deputies Day and Milbrandt blocked in the Corvette; they approached

the vehicle and identified themselves as law enforcement; they communicated that they were investigating car larcenies in the area and also communicated the traffic law violation; and they asked Defendant for identification and asked that he remain in the vehicle. Defendant refused to stay in the vehicle and refused to provide identification. Instead, he was angry and belligerent, acting in a suspicious and nervous manner. Defendant exited the vehicle against the express instructions from law enforcement, and then refused to comply with the direction to keep his hands on the vehicle so that a pat frisk could be performed.

The Court concludes that, based upon the lawfulness of the traffic stop and Defendant's suspicious behavior, including his belligerence and failure to comply with the officers' instructions, the law enforcement officers' conduct in asking Defendant to place his hands on the vehicle so that he could be frisked was justified. *See United States v. Soares*, 521 F.3d 117, 121 (1st Cir. 2008) (officers reasonably feared for safety and conducted pat frisk where, after lawful traffic stop, the defendant failed to comply with officers' directions, "used abusive and profane language, and . . . became increasingly agitated as the stop progressed"); *see also United States v. Moore*, No. 03-CR-32E, 2006 WL 462103, at *4 (W.D.N.Y. Feb. 24, 2006) (explaining that "once it is established, as it is here, that the officer's actions were justified at their inception, the question becomes whether the officer's subsequent actions were fairly responsive to the emerging tableau— to wit, the circumstances originally warranting the stop, informed by what occurred and what the officer learned as the stop progressed," and finding pat frisk permissible where, after lawful stop, individual who was known to have been associated with gang and drug-

related activity acted in an "evasive manner"). In fact, Deputies Day and Milbrandt never even had the opportunity to ask the ordinary inquiries related to a traffic stop, such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," *Rodriguez*, 135 S. Ct. at 1615, due to Defendant's lack of cooperation. Moreover, while the defense suggests that Deputy Day "put his hands on Mr. Lucas and found no weapons," (Dkt. 113 at 7), in fact, Deputy Day was unable to conduct the pat frisk because of Defendant's lack of cooperation. Instead, Defendant refused to keep his hands on the vehicle, refused to cooperate in the frisk, and ultimately ended up running into Deputies Day and Milbrandt, knocking everyone to the ground, telling his son to run, and fleeing from the scene.

Separate and apart from the reasonable safety precautions conducted adjacent to a lawful traffic stop, the Court also concludes that, at the point in time when Defendant emerged from the vehicle, acting nervously and uncooperatively, the deputies' attempt to frisk Defendant was further justified by knowledge of Defendant's alleged drug trafficking. In other words, even though the exact contours of Deputy Day's knowledge concerning Defendant's alleged drug trafficking may be unclear so as to create questions as to whether that knowledge justified the initial stop, Deputy Day certainly had general knowledge concerning the investigation and Defendant's alleged association with Mr. Daniels. Thus, while this generalized knowledge may not have justified the initial stop, once the traffic stop lawfully occurred, that generalized knowledge coupled with Defendant's behavior created reasonable suspicion and justified the effort to check for weapons. *See, e.g., United States v. Alexander*, 907 F.2d 269, 273 (2d Cir. 1990) ("[T]his Court has repeatedly

acknowledged the dangerous nature of the drug trade and the genuine need of law enforcement agents to protect themselves from the deadly threat it may pose.").

Furthermore, by the time that Defendant was apprehended on Genesee Street, based upon the totality of the circumstances, including Defendant's physical altercation with Deputies Day and Milbrandt who were conducting a lawful traffic stop, Defendant's attempted efforts to open the car doors of other vehicles, and Defendant's flight through traffic on Genesee Street in a dangerous and chaotic manner, law enforcement plainly had a reasonable basis to conclude that Defendant had committed an offense justifying his arrest.

*United States v. Goines*, 604 F. Supp. 2d 533 (E.D.N.Y. 2009), relied upon by Defendant (Dkt. 113 at 26), does not require a different result. In that case, the court determined that while the officers could lawfully approach the defendant and question him, they did not have reasonable suspicion or probable cause to detain him when he walked away from the encounter. *Id.* at 540. The court concluded that the officer's testimony was not credible that the defendant engaged in any suspicious activity. *Id.* at 540-42.

Here, in contrast, the credible evidence supports law enforcement's activities. There was probable cause to believe that the Corvette was being operated in violation of the Vehicle and Traffic law. The deputies lawfully stopped the vehicle and approached the vehicle, informing Defendant of the unlawful window tinting. Defendant was belligerent and uncooperative, disobeying the deputies' instructions and refusing to provide identification. Ultimately, Defendant knocked the deputies to the ground and fled. Based upon a totality of the circumstances, the Court concludes that Defendant's Fourth

Amendment rights were not violated during this interaction, and his motion to suppress on this ground is denied.

## II. MOTION TO SUPPRESS STATEMENTS MADE BY DEFENDANT DURING CUSTODIAL INTERVIEW

Defendant contends that the statements he made during his interview at the Erie County Sheriff's Office on May 15, 2017, to Agents Wisniewski and Webb should be suppressed because he asked for and was denied counsel, and because any statements were involuntary due to Defendant's medical condition and the agents' alleged threats involving his son and girlfriend. (Dkt. 35-1 at 15-23).[8]  The Court concludes that the credible evidence does not support Defendant's version of events.  Instead, the credible evidence establishes that Defendant was provided *Miranda* warnings, he denied any need for medical treatment, neither his son nor girlfriend were threatened, and Defendant provided statements to Agents Wisniewski and Webb in a voluntary and knowing manner.

The Government must prove by a preponderance of the evidence that Defendant knowingly and voluntarily waived his *Miranda* rights. *United States v. Gaines*, 295 F.3d 293, 297 (2d Cir. 2002); *see United States v. Orlandez-Gamboa*, 320 F.3d 328, 332 (2d

---

[8]  Defendant also contended in his initial motion papers that statements made in the parking lot of the hotel after his arrest should be suppressed because he was asked questions when he arrived back at the hotel without being provided *Miranda* warnings. (Dkt. 35-3 at ¶ 11; Dkt. 35-1 at 14-15). There is no evidence before the Court that statements were obtained from Defendant as a result of any interrogation at the hotel parking lot, and no such interactions are reflected on the dash camera video. (Govt. Ex. 10). Similarly, Sergeant McAdams testified that he did not ask Defendant any questions about his case. (T at 99). Defendant did not pursue this issue further with his post-hearing memoranda, and thus, the Court concludes that Defendant is not seeking to suppress any such statements.

Cir. 2003) ("A confession is admissible under the Constitution only if it is made voluntarily."). "To prove a valid waiver, the government must show (1) that the relinquishment of the defendant's right was voluntary, and (2) that the defendant had full awareness of the rights being waived and the consequences of waiving that right." *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)); *see Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) ("If the State establishes that a *Miranda* warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate 'a valid waiver' of *Miranda* rights. The prosecution must make the additional showing that the accused understood these rights." (citations omitted)).

"No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997) (quoting *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988)). As the Second Circuit has explained: "factors to be considered include: the characteristics of the accused, such as his experience, background, and education; the conditions of the interrogation; and the conduct of law enforcement officials, notably, whether there was physical abuse, the period of restraint in handcuffs, and use of psychologically coercive tactics." *Id.* (citing *Green*, 850 F.2d at 901-02). "Subsidiary questions" include "the length and circumstances of [an]

interrogation . . . or whether the police engaged in the intimidation tactics alleged by the defendant. . . ." *Id.* (internal quotations and citations omitted) (alteration in original).

"A statement is not voluntary if it is obtained by any type of physical or psychological coercion or by improper inducement so that a defendant's will was overborne." *United States v. Santiago*, 720 F. Supp. 2d 245, 252 (W.D.N.Y. 2010) (citation omitted). "A confession is thus involuntary if it is obtained by techniques and methods offensive to due process, or under circumstances in which the suspect clearly had no opportunity to exercise a free and unconstrained will." *United States v. Juvenile Male*, 968 F. Supp. 2d 490, 504 (E.D.N.Y. 2013) (internal quotations and citations omitted). However, "a confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials." *United States v. Guarno*, 819 F.2d 28, 31 (2d Cir. 1987). "The question key to voluntariness is whether the subject's 'will was overborne.'" *United States v. Corbett*, 750 F.3d 245, 253 (2d Cir. 2014) (quoting *United States v. Plugh*, 648 F.3d 118, 128 (2d Cir. 2011)).

Here, the Government has met its burden to establish that Defendant's statements were made knowingly and voluntarily. Agent Wisniewski provided credible testimony that he read Defendant his *Miranda* rights at the commencement of the interview from an advice-of-rights card provided to him by the DEA (Govt. Ex. 14),[9] Defendant indicated

---

[9]     The Court is not persuaded by Defendant's efforts to challenge the veracity of the timing of the *Miranda* warnings based upon Agent Wisniewski's notes. (*See* Dkt 113 at 17). Agent Wisniewski credibly explained his note-taking process and the manner in which *Miranda* warnings were administered. (T at 201-203, 245). Moreover, Defendant's own declaration acknowledged that he was provided *Miranda* warnings. (Dkt. 35-3 at ¶ 14).

that he understood his rights, and Defendant waived those rights and agreed to talk to the agents. (T at 202-203). Agent Wisniewski credibly testified to Defendant's calm demeanor during the interview and the fact that he appeared to grasp the discussion. (*Id.* at 210).

The Court also concludes that notwithstanding Defendant's statements in his declaration that he requested and was denied medical attention (Dkt. 35-3 at ¶ 12), the credible evidence does not support this claim. Agent Wisniewski testified that Defendant denied needing any medical care, instead claiming that it was just an old injury. (T at 203-204). This is consistent with Defendant's statements reflected on the dash camera video during his interactions with Sergeant McAdams, wherein Defendant repeatedly denied needing any medical treatment. (Govt. Ex. 10). Defendant alleges that he suffered broken ribs and he was provided pain medication when he was ultimately treated by medical personnel (Dkt. 35-3 at ¶ 17), but there is no evidence to support these claimed injuries (such as medical records) other than Defendant's written statements in his declaration.[10]

---

[10] In reaching its conclusions about Defendant's medical condition, the Court has not placed any weight on Government Exhibit 21. Government Exhibit 21 was the P-163 Arrest Data Form pertaining to Defendant which contained a box checked "no" with respect to whether Defendant was injured. (Govt. Ex. 21). The Government offered Exhibit 21 through Deputy Day, who was familiar with the form and the process utilized to complete the form. (T at 157). The Court allowed the admission of the exhibit over defense counsel's objections (*id.* at 158), because "[e]videntiary rules governing criminal trials do not apply to suppression hearings which are conducted to determine the admissibility of evidence in the first instance." *United States v. Miller*, 382 F. Supp. 2d 350, 362 (N.D.N.Y. 2005); *see also United States v. Matlock*, 415 U.S. 164, 175 (1974) ("[I]n proceedings where the judge [her]self is considering the admissibility of evidence, the exclusionary rules, aside from rules of privilege, should not be applicable; and the judge should receive the evidence and give it such weight as [her] judgment and experience counsel."). Thus, while admissible at the suppression hearing, the Court gives the exhibit

Nonetheless, even crediting the veracity of Defendant's claimed injuries, there is no credible proof to support the notion that Defendant requested medical treatment or that his requests were denied.

Similarly, the credible evidence does not support Defendant's claims that his son and girlfriend were threatened. Agent Wisniewski credibly testified that he did not threaten Defendant's son or girlfriend. (T at 216). In fact, according to Agent Wisniewski, Defendant never even asked about his son. (T at 276). Moreover, the Court agrees with the Government's argument that the fact Defendant refused to answer some of the agents' questions demonstrates that he was knowingly and voluntarily waiving his *Miranda* rights. (Dkt. 111 at 12-13). Similarly, Agent Wisniewski's stated belief that the interview was being recorded, supports the conclusion that Defendant was not threatened during the interview. (T at 204-205). In other words, to accept Defendant's logic, the Court would have to conclude that the law enforcement agents intentionally caused the recording equipment to malfunction *and then* Agent Wisniewski committed perjury by testifying otherwise during the suppression hearing. The Court rejects that theory as the credible evidence simply does not support it.

The Court also concludes that the credible evidence establishes that Defendant did not ask for an attorney. Defendant makes this claim in his declaration (Dkt. 35-3 at ¶ 14),

_____

no weight. Deputy Day did not complete the form pertaining to Defendant, he did not know the individual who signed the form, and he lacked personal knowledge concerning Defendant's condition at the time the form was completed. (T at 157-158; 160-161). Thus, the Court finds that the form's statement that Defendant was not injured is simply not probative.

but Agent Wisniewski credibly testified that Defendant never asked for an attorney in his presence (T at 204). In fact, while this allegation was a central focus of Defendant's declaration, there was no cross-examination of Agent Wisniewski on this issue at the suppression hearing.

Finally, while not raised in his declaration, Defendant now claims that promises were made to him in return for his cooperation. (Dkt. 113 at 28-29). Agent Wisniewski testified that he discussed cooperation with Defendant and potential benefits in only a very generalized manner. (T at 237-239). Moreover, while Defendant challenges the veracity of Agent Wisniewski's testimony on this subject (Dkt. 113 at 29-30), not only did the Court find Agent Wisniewski credible, but Defendant has offered nothing in his declaration on this subject contesting Agent Wisniewski's version of events (*see* Dkt. 35-3). Generalized discussions of cooperation do not render Defendant's statements involuntary or coerced. *See, e.g.*, *United States v. Haak*, 884 F.3d 400, 409-414 (2d Cir. 2018) (vague promises of leniency or cooperation do not rise to the level of coercion so as to render a confession involuntary); *Corbett*, 750 F.3d at 253 (law enforcement officer who wore Masonic ring and promised to treat defendant like a "Brother Mason" did not render waiver of *Miranda* rights involuntary); *Gaines*, 295 F.3d at 299 ("[V]ague promises of leniency for cooperation are just one factor to be weighed in the overall calculus and generally will not, without more, warrant a finding of coercion."); *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) ("Generally, promises of leniency will not render a confession involuntary."); *Guarno*, 819 F.2d at 31 ("[A] confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials.");

*United States v. Pomares*, 499 F.2d 1220, 1221-22 (2d Cir. 1974) (neither unfair nor overreaching for agents to explain to defendant that he was facing heavy penalties).

In sum, based upon a consideration of all the circumstances related to the interview, the Court concludes that the Government established by a preponderance of the evidence that Defendant voluntarily waived his rights with full awareness of his rights and the consequences of his waiver.

## III.    CONSENT TO SEARCH CELL PHONES

Defendant contends that he was coerced into providing consent to search his cell phones, for essentially the same reasons he alleges that his statements were not voluntary— he needed and was denied medical treatment, and his son and girlfriend had been threatened. (Dkt. 35-1 at 23-24). Defendant also asserts that at the time he provided the consent, he had been subject to a lengthy interrogation. (*Id.*). According to Defendant, his consent was obtained "when he was under duress, in pain, broken down physically and mentally, and concerned over the well-being of his son and girlfriend." (*Id.* at 24). Defendant also argues that the consent was overly broad and deprived him of an opportunity to place limits on the search. (Dkt. 113 at 30-31).

A voluntary consent search is one of the well-recognized exceptions to the warrant requirement. *See, e.g., Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."). "The government has the burden of proving consent voluntarily given by a preponderance of the evidence." *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983). "The ultimate question presented is

whether the officer had a reasonable basis for believing that there had been consent to the search." *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995) (quotation omitted). Resolution of that question is an issue of fact based upon a totality of the circumstances, including the "age, education, [and] intelligence [of the defendant], [the] length of detention, [the] use of physical punishments or deprivations, and whether the alleged consenting person was advised of his constitutional rights[.]" *United States v. Puglisi*, 790 F.2d 240, 243 (2d Cir. 1986); *see also Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?").

Based upon the totality of the circumstances, it was objectively reasonable for Agent Wisniewski to believe that Defendant consented to the search of his cell phones. As discussed above, the Court finds that the credible evidence does not support Defendant's allegations that he was threatened or denied medical treatment. Moreover, Agent Wisniewski testified that Defendant was not handcuffed nor were the agents' firearms displayed in any manner. Rather, "[Defendant] was comfortable, he was confident. He seemed intelligent and articulate, and the conversation was very free flowing." (T at 210). The interview was not contentious and it lasted a little more than an hour. (*Id.*). Defendant's consent was requested sometime in the middle of the interview (*id.* at 206), Defendant read the written consent form (*id.* at 209), the form was explained to him (*id.* at

209), and Defendant placed his initials on the appropriate places on the form and signed it (Govt. Ex. 22).

Moreover, it was objectively reasonable for law enforcement to consider Defendant's consent to search the cell phones as encompassing the entirety of the phones. *See Jimeno*, 500 U.S. at 251 (suspect's general consent to search car included consent to examine paper bag lying on floor of the car). Defendant granted law enforcement permission to search his phones, and he did not place any explicit limitation on the scope of the search. (*See* Govt. Ex. 22 ("anything found by the law enforcement officers considered necessary for their investigation will be collected and removed as evidence")).

## IV. DEFENDANT'S CHALLENGES TO SEARCH WARRANTS ISSUED FOR STORAGE LOCKER AND COMFORT SUITES ROOM

"[P]robable cause to search a place exists if the issuing judge finds a 'fair probability that contraband or evidence of a crime will be found in a particular place' and a federal court must apply a 'totality-of-the-circumstances analysis' in pursuing this inquiry." *United States v. Ponce*, 947 F.2d 646, 650 (2d Cir. 1991) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

> [T]he duty of a court reviewing the validity of a search warrant is simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed. A search warrant issued by a neutral and detached magistrate is entitled to substantial deference, and doubts should be resolved in favor of upholding the warrant.

*United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993) (quotations and citations omitted).

In his initial motion papers, Defendant contended that all evidence obtained as a result of the initial alleged illegal seizure should be excluded, including any evidence

obtained from the warrants issued for the search of Room #113 at the Comfort Suites and the search of Storage Locker #632 at Life Storage. (Dkt. 35-1 at 13). A search warrant was signed by Erie County Court Judge Kenneth F. Case on or about May 17, 2017, authorizing the search of Storage Locker #632 at Life Storage located at 1275 Sheridan Drive in Tonawanda, New York. (Dkt. 35-2 at 9). Two days earlier (the date of Defendant's arrest), Judge Case signed a search warrant at approximately 7:51 PM, authorizing the search of Room #113 at the Comfort Suites. (Dkt. 44-1 at 5-6). Defendant challenged the cursory nature of the search warrant affidavit supporting the search warrant for the hotel room and requested access to the *in camera* material. (Dkt. 44 at 4-10). The affidavit supporting the warrant issued for the hotel room referenced information provided *in camera* by a confidential source. (Dkt. 44-1 at 3).

Judge Case's notes were subsequently produced by the Government. The notes for the search warrant issued for Room #113 reference Dominic Daniels meeting with Defendant, described as a "known cocaine dealer," in Room #113 at the Comfort Suites and purchasing a large quantity of cocaine. (Def. Ex. 11A[11]). The notes also reference Mr. Daniels' arrest after a drug transaction with a ½ kilogram of cocaine in a blue bag, and Defendant's possession of the key to Room #113 at the time of his arrest. (*Id.*). According to the notes, the Erie County Sheriff's Department had previously checked with the hotel

---

[11] Judge Case's handwritten notes pertaining to the search warrant issued on May 15, 2017, were introduced into evidence by Defendant at the suppression hearing on July 13, 2018, as Exhibit 11A. (T at 285).

and Defendant was identified as renting Room #113. (*Id.*). The notes also reference Defendant's arrest after fleeing from law enforcement at the Comfort Suites. (*Id.*).

Judge Case's notes for the storage locker warrant indicate that the keys for the storage unit were possessed by Defendant at the time of his arrest, a narcotics dog hit on Unit #632 at Life Storage, Defendant's keys fit into the lock on Unit #632, and Defendant has a significant history of cocaine dealing. (Dkt. 124). The notes also indicate that the prior affidavits are relevant and incorporated into the warrant application for the storage unit. (*Id.*).

A.    Search Warrant for Unit #632 at Life Storage

Defendant contends that the search of Unit #632 and the seizure of any evidence should be suppressed because the probable cause to search the locker resulted from the illegal seizure of Defendant and the evidence obtained after his illegal arrest. (Dkt. 113 at 31-32). For the reasons already discussed, the Court rejects the argument that Defendant was illegally seized or arrested, and therefore, Defendant's motion to suppress the locker evidence on this ground is denied.

Defendant also challenges the narcotics dog's search of the storage locker because it would necessarily have had to occur on the "curtilage" of the storage locker where Defendant had a reasonable expectation of privacy. (Dkt. 113 at 33-34). Defendant seeks to extend the holding of *Florida v. Jardines*, 569 U.S. 1 (2013), that a dog sniff just outside of a home at its curtilage constitutes a search within the meaning of the Fourth Amendment. *Id.* at 7-8. Defendant argues that just like a home, the "curtilage" outside the locker rented at Life Storage was protected.

- 43 -

A "'canine sniff' does not constitute a search within the meaning of the Fourth Amendment." *United States v. Iverson*, 897 F.3d 450, 461 (2d Cir. 2018) (quoting *United States v. Place*, 462 U.S. 696, 707 (1983)). As a result, "[a]s long as the observing person or the sniffing canine are legally present at their vantage [points] when their respective senses are aroused by obviously incriminating evidence, a search within the meaning of the Fourth Amendment has not occurred." *Iverson*, 897 F.3d at 461 (citations omitted) (alterations in original).

Contrary to Defendant's argument, the principles of *Jardines* do not extend to the common area outside a storage locker at a commercial establishment. *See United States v. Parrilla*, No. 13 Cr. 360(AJN), 2014 WL 2111680, at *4-6 (S.D.N.Y. May 13, 2014) ("concept of curtilage is limited to the home" and therefore, dog sniff outside business did not constitute a search under *Jardines* standard). In other words, the principles supporting the recognition of homes as "sanctuaries for private activities," *id.* at *5, do not extend to commercial establishments. *Cf. Jardines*, 569 U.S. at 6 ("[W]hen it comes to the Fourth Amendment, the home is the first among equals.").

Moreover, Defendant has failed to establish that he had a reasonable expectation of privacy in the common area outside the storage locker. His declaration states that he had an expectation of privacy "in" his locker, but he makes no mention of the area outside the locker. (Dkt. 35-3 at ¶ 5). Indeed, no expectation of privacy to the common area outside the locker would be reasonable. *See United States v. Hamilton*, 538 F.3d 162, 167 (2d Cir. 2008) (A court's "inquiry involves two distinct questions: first, whether the individual had

a subjective expectation of privacy; and second, whether that expectation of privacy is one that society accepts as reasonable.").

Consistent with these principles, courts in other circuits have rejected the concept that the common area outside a storage locker at a commercial establishment is entitled to an expectation of privacy. *See United States v. Cook*, 904 F.2d 37 (6th Cir. 1990) (unpublished) (rejecting argument that expectation of privacy extended to area outside a rented storage locker in a public facility); *United States v. Venema*, 563 F.2d 1003, 1005-06 (10th Cir. 1977) (dog sniff of air outside locker rented by defendant from storage company was not a search); *United States v. White*, Criminal Action No. 07-365-01, 2013 WL 12221280, at *5 (E.D. Pa. April 26, 2013) (defendant could not establish that he had a reasonable expectation of privacy in the storage facility's common open-air area).

Finally, even if there was a legitimate challenge to the dog sniff outside the locker, it is apparent that the issuance of the warrant for the storage locker relied on far more than just the dog sniff, including the fact that the keys for the storage unit were possessed by Defendant, Defendant has a significant history of cocaine dealing, Defendant had a known relationship with Mr. Daniels, Defendant fled from law enforcement at the Comfort Suites where he had rented a room, and Mr. Daniels was arrested in possession of cocaine and large sums of money after leaving the Comfort Suites. (Dkt. 124).

B.    Search of Room #113 at the Comfort Suites

Defendant asserts that the information provided to Judge Case for issuance of the warrant for Room #113 at the Comfort Suites was insufficient to establish probable cause. (Dkt. 113 at 35). Defendant argues that there is no factual basis for the statements in Judge

- 45 -

Case's notes that Mr. Daniels purchased drugs in Room #113, and the fact that Defendant rented Room #113, is insufficient to establish probable cause. (*Id.*). Defendant insists that a hearing consistent with *Franks v. Delaware*, 438 U.S. 154 (1978), is appropriate because even though the *in camera* notes indicate that Mr. Daniels purchased drugs from Defendant in Room #113 and exited with a blue bag, "it is more likely that Daniels was never seen entering into room 113." (Dkt. 113 at 36). In other words, Defendant contends the suggestion to Judge Case that Mr. Daniels was observed entering Room #113 is false.

"Ordinarily, a search carried out pursuant to a warrant is presumed valid. However, in certain circumstances, *Franks* permits a defendant to challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search and seizure." *United States v. Mandell*, 752 F.3d 544, 551-52 (2d Cir. 2014) (quotations and citations omitted). "[T]o suppress evidence obtained pursuant to an affidavit containing erroneous information, the defendant must show that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause [or necessity] finding." *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (quoting *United States v. Canfield*, 212 F.3d 713, 717-18 (2d Cir. 2000)) (alterations in original). The standard for entitlement to a *Franks* hearing is high, *see Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991), and requires a "substantial preliminary showing" that a false statement was knowingly and intentionally, or with reckless disregard for the truth, included in the affidavit for the search warrant, *Franks*, 438 U.S. at 155-56; *see also United States v. Mandell*, 710 F. Supp. 2d 368, 372

(S.D.N.Y. 2010) ("Hearings under *Franks* are not freely granted."). With respect to the second step of the *Franks* test, the Second Circuit has explained:

> To determine if the false information was necessary to the issuing judge's probable cause determination, *i.e.*, material, "a court should disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant." If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate. As with the inclusion of false information, "[o]missions from an affidavit that are claimed to be material are governed by the same rules." The ultimate inquiry is whether, after putting aside erroneous information and material omissions, "there remains a residue of independent and lawful information sufficient to support probable cause."

*Canfield*, 212 F.3d at 718 (alterations in original) (quoting *United States v. Ferguson*, 758 F.2d 843, 848 (2d Cir. 1985)).

Here, Defendant fails to satisfy either prong of the *Franks* test. Defendant speculatively alleges that Judge Case was misled about whether Mr. Daniels was surveilled entering Room #113 (as opposed to more generally the Comfort Suites). However, the notes are not a verbatim transcript of what was told to Judge Case during the *in camera* meeting. Moreover, even if Defendant could meet the first prong of the *Franks* test, the Court concludes that there was more than sufficient probable cause to support the search warrant for Room #113 without the information about Mr. Daniels allegedly entering Room #113. Judge Case was presented with evidence that Mr. Daniels and Defendant were connected, Defendant was the subject of a federal investigation into his cocaine trafficking activities, Mr. Daniels exited the Comfort Suites with a blue bag that police subsequently determined contained more than 500 grams of cocaine, Defendant then arrived at the Comfort Suites and when questioned by law enforcement fled, Defendant possessed at the

time of his arrest a key for Room #113, and Defendant rented Room #113 on May 15, 2017. This information supports a probable cause finding. Whether Judge Case was told that Mr. Daniels was observed entering Room #113, or more generally the Comfort Suites, is not entirely clear from the handwritten notes, but in any event, an observation of Mr. Daniels entering Room #113 was not necessary for a probable cause determination.

## V.   SUPPRESSION OF EVIDENCE OBTAINED DURING ENCOUNTER WITH LAW ENFORCEMENT ON JANAURY 26, 2017, AT BUFFALO INTERNATIONAL AIRPORT

In his post-hearing memorandum of law submitted after completion of the suppression hearing concerning evidence and statements obtained on May 15, 2017, Defendant raised for the first time a suppression argument addressed to his law enforcement encounter at the Buffalo International Airport on January 26, 2017. (Dkt. 113 at 20-22). Agent Wisniewski testified to an encounter on that date with Defendant where, among other things, Defendant presented identification in the name of Johnny McDuffy. (T at 184-185).

However, Defendant never raised an issue concerning the evidence obtained during this encounter at the Buffalo International Airport, prior to filing his post-suppression hearing memorandum of law. Having never moved to suppress this evidence, Defendant cannot attempt to raise the issue for the first time in a post-hearing memorandum of law. *See, e.g., United States v. Evans*, No. 12-CR-235, 2015 WL 224411, at *2 (W.D.N.Y. Jan. 15, 2015) ("[I]n his post-hearing submission, [the defendant] raises a new ground for suppression. . . . This argument should not even be considered, since it was not raised in defendant's pre-hearing motion." (quotation omitted)); *United States v. Acosta*, No. S1 12

- 48 -

CR 224 PGG, 2013 WL 1890337, at *6 n.6 (S.D.N.Y. May 6, 2013) ("[The defendant's argument] was not raised in [the defendant's] suppression motion, but instead was presented for the first time in a post-hearing brief. This alone is grounds for rejecting [the] claim." (citations omitted)).

The Government briefly elicited testimony from Agent Wisniewski at the suppression hearing about the encounter on January 26, 2017, as general background information about law enforcement's investigation of Defendant prior to May 15, 2017. (Dkt. 116 at 2). The suppression hearing was not focused on the January 26, 2017 encounter (encompassing only about three pages of almost 300 pages of testimony) (*see* T at 184-186) because again, Defendant never properly raised the issue pursuant to Fed. R. Crim. P. 12(b)(3)(C).

The Government argues that any efforts by Defendant to suppress the evidence obtained on January 26, 2017, would be untimely. (Dkt. 116 at 2 (citing Fed. R. Crim. P. 12(c)(3) ("If a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause."))). The Court need not resolve that issue at this juncture, because Defendant has failed to file a motion addressed to the evidence seized on January 26, 2017. If and when Defendant attempts to pursue such a motion, the Court will address its untimeliness and whether good cause exists to excuse any late filing.

## VI.    OTHER ISSUES RAISED IN OMNIBUS MOTION

Pursuant to a Text Order entered by Judge McCarthy on May 18, 2018, the parties agreed that all issues raised by the omnibus pretrial motions other than suppression had been resolved. (Dkt. 72). The undersigned has reviewed the audio transcript of the appearance pertaining to that Text Order, and the Text Order is consistent with the parties' representations during the appearance before Judge McCarthy on May 17, 2018. However, the "other issues" that were resolved are not discussed with any specificity during that appearance.

Moreover, during the appearance before the undersigned on July 13, 2018, counsel suggested to the Court that the other issues raised by the omnibus motion, at least in part, were still outstanding and that the parties rested on their papers. (T at 148-152). As suggested at that appearance on July 13, 2018, no rulings were issued by Judge McCarthy on the non-suppression omnibus motion issues.

Therefore, the undersigned will also address the non-suppression issues raised by the omnibus motion that still appear to be outstanding and relevant.[12]

### A.    Motion to Compel Disclosure of *Brady* and *Giglio* Material

Defendant set forth in his omnibus motion itemized requests for information that he contends fall within the scope of the Government's obligations under *Brady v. Maryland*,

---

[12]    Some of the issues, such as Defendant's argument concerning *Bruton v. United States*, 391 U.S. 123 (1968) (Dkt. 35-1 at 25-26) and Defendant's argument concerning Rule 404(b) evidence concerning Mr. Daniels (*id.* at 26), were necessarily resolved by Mr. Daniels' guilty plea. Similarly, the issues raised by Defendant with respect to the *in camera* search warrant materials (Dkt. 35-1 at 26-27) were resolved by the Government's production of Judge Case's handwritten notes.

373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). (Dkt. 35-1 at 27-31).

The Government responded by acknowledging its continuing obligations under *Brady* but objecting to many of Defendant's requests as outside the scope of its obligations under *Brady* and *Giglio*. (Dkt. 42 at 12-14). The Government further stated its agreement to provide "impeachment <u>Brady</u> material . . . in accordance with the schedule set by the District Court prior to trial and no later than when the government produces and delivers the <u>Jencks</u> Act material in this case." (*Id.* at 13-14).

Here, the Pretrial Order expresses the preference that all material pursuant to 18 U.S.C. § 3500 be disclosed no later than 30 days prior to trial. (Dkt. 76 at 3). To the extent that Defendant seeks a further or broader order from the Court, the request is denied. Defendant's itemized requests set forth in his omnibus motion exceed the obligations imposed by *Brady*, which requires production of evidence favorable to an accused that is material either to guilt or punishment. 373 U.S. at 87. Moreover, while *Brady* information must be disclosed in time for its effective use at trial, Defendant has failed to identify any reason that the Court's Pretrial Order or the Government's commitment to providing information in accordance with that Pretrial Order, would not provide sufficient time for its effective use at trial. *See generally United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001). Therefore, the Court denies Defendant's motion on this issue without prejudice.

B.    Motion for Leave to Supplement and/or Make Additional Motions

Defendant contends that he has "attempted to encompass within these motion papers all forms of pre-trial relief that may be properly requested at this time" but he asks that he be allowed to file additional motions or supplement his existing motions in the event of

further pretrial disclosures by the Government. (Dkt. 35-1 at 32). The Government responds that it would not object to the filing of additional motions "[i]f good cause is shown[.]" (Dkt. 42 at 14). Subsequent to the initial filing, Defendant filed the supplemental motion to suppress that is the subject of Judge McCarthy's Report and Recommendation, without objection from the Government. (*See* Dkt. 45). To the extent Defendant seeks leave to supplement or make any additional pretrial motions, the Court denies this aspect of Defendant's omnibus motion without prejudice.

C.     Motion for Joinder

Defendant moved to join the motion of his co-defendant "to the extent that such motions apply to him and are not adverse or inconsistent with his interests." (Dkt. 35-1 at 32). The Government objected to this request unless Defendant specified which portions of his co-defendant's motion he intended to join. (Dkt. 42 at 14). In reply, Defendant submitted that he joined in his co-defendant's "Motion for Identity of Informants." (Dkt. 44 at 10).

In his pretrial omnibus motion, Mr. Daniels indicated that "[r]eview of material disclosed to date reveals that investigators received information from an individual, but whose identity is anonymous." (Dkt. 34 at 23). Mr. Daniels generally argued his need for the information to prepare an adequate defense. (*Id.*). The Government objected to providing this information, arguing that Mr. Daniels had failed to meet his burden of showing a "particularized need" for the information and that the Government's interest in protecting confidential informants' safety outweighed Mr. Daniel's generalized and unsupported statement of need. (Dkt. 41 at 14-15).

Mr. Daniels never pursued his pre-trial motion in this regard because of his guilty plea, and accordingly, to the extent that Defendant has attempted to join in this motion, he has failed to establish his right to this information. *See generally Roviaro v. United States*, 353 U.S. 53 (1957). Thus, the Court denies the motion without prejudice.

D. <u>Government's Motion for Reciprocal Discovery</u>

Finally, pursuant to Fed. R. Crim. P. 16(b), the Government requested reciprocal discovery as set forth in its memorandum filed on February 2, 2018. (Dkt. 42 at 19). It does not appear that Defendant opposed this request. (*See generally* Dkt. 44). The Court grants the Government's motion for reciprocal discovery.

## **CONCLUSION**

For the foregoing reasons, the Court denies Defendant's motion to suppress evidence and statements obtained on May 15, 2017 (Dkt. 35), the Court further denies without prejudice the non-suppression issues that remain outstanding in Defendant's omnibus pretrial motion (*id.*), and the Court grants the Government's request for reciprocal discovery (Dkt. 42).

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: October 5, 2018
Rochester, New York